SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-14-941

| | |
|---|---|
| MAE WEAVER | **Opinion Delivered** May 27, 2015 |
| APPELLANT | APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION [NOS. G103215, G302108] |
| V. | |
| ARKANSAS DEPARTMENT OF CORRECTION and PUBLIC EMPLOYEE CLAIMS | |
| APPELLEES | AFFIRMED |

## M. MICHAEL KINARD, Judge

Appellant Mae Weaver appeals from the decision of the Arkansas Workers' Compensation Commission that she failed to prove that her neck injury was a compensable injury. She argues that there was sufficient proof, including medical evidence that the Commission disregarded, that her condition was causally related to her work activities. We affirm.

In March 2013, appellant alleged that she had suffered a compensable gradual-onset neck injury from her work at the Arkansas Department of Correction (ADC). Appellant had previously litigated a shoulder-injury claim against the same employer, but the Commission found that the injury was not compensable and this court affirmed. *See Weaver v. Arkansas Department of Correction*, 2013 Ark. App. 158. A hearing was held on her neck-injury claim on February 26, 2014.

Appellant testified that she was fifty-four years old. She had worked for the ADC as

SLIP OPINION

a correctional officer from January 2006 through March 2011. Appellant usually worked in the tower, where her duties involved raising and lowering a basket on a rope pulley system using her arms. Appellant described this as strenuous work, noting that the basket alone weighed fifteen to twenty pounds. When weapons were put in the basket, the total weight was usually about twenty-five pounds, but at times it could weigh a maximum of thirty to forty pounds. Appellant said that she raised and lowered the basket ten to fifteen times per day and that it put pressure and strain on her neck and upper extremities.

Deputy Warden Richard Ball testified that the steel-mesh basket weighed about fifteen pounds and that it would be unusual for the basket and its contents to weigh thirty to forty pounds. He said that raising and lowering the basket was not strenuous because the pulley assists and bears most of the weight. Appellant said that she had discussed the heaviness of the basket with a supervisor but did not report any neck problems. Appellant testified that she had also used her arms to pat down inmates, climb a ladder to get into the tower, and fire weapons and lift weights for her yearly physical. She claimed that she had not engaged in any strenuous activity outside of work while she was employed or thereafter.

Appellant said that she first began having neck-related symptoms in 2006, about six months after she started work at the ADC; however, her symptoms were not severe enough to seek treatment. In 2007, she sought treatment with her primary-care physician, Dr. Sudhir Kumar. She complained of pain and burning in her right arm, numbness in three fingers, and pain in her elbow and neck; the office note stated that there was no trauma and that her symptoms had been going on for a couple of weeks. Dr. Kumar took an x-ray of

2

SLIP OPINION

her cervical spine, which showed "mild arthritic changes, age appropriate." Appellant testified that this was mild pain that she learned to live with and that she did not know it was work related at the time.

In May 2011, appellant had surgery on her right shoulder, performed by Dr. Jay Lipke. She followed up with Dr. Lipke in the months after her surgery. A clinic note dated December 19, 2011, stated that appellant was having continued problems with both shoulders, and she had "a new orthopedic complaint (right cervical, right shoulder and right upper extremity pain) to the level of the hand." Cervical x-rays were done, and Dr. Lipke diagnosed "cervical degenerative disc disease with right upper extremity cervical nerve root irritation." Appellant testified that this was when she found out her neck was causing her symptoms, but she still did not realize that her problems were caused by her work.

Appellant began seeing Dr. Robert Abraham in June 2012 with complaints of neck pain and right arm pain. He diagnosed her with cervical radiculopathy. On July 3, 2012, Dr. Abraham performed an anterior cervical discectomy with fusion at C4–5, C5–6, and C6–7. Appellant testified it was after her cervical surgery that she found out her neck problems were work related. She said that Dr. Abraham informed her family during the surgery that she had an extensive amount of "wear and tear" in her neck and that it was more than he had anticipated. Appellant concluded that this "wear and tear" was work related because she could not figure out anything else that would have caused extensive wear and tear.

Appellant continued seeing Dr. Abraham after her surgery. On August 31, 2012, Dr.

SLIP OPINION

Abraham signed what appellant describes as a preprinted form with two options, apparently prepared by appellant's former attorney. Dr. Abraham placed a checkmark next to the following statement:

> It is my opinion to a reasonable degree of medical certainty, or at least 51% probability based upon the information presented to me, including a history given by the patient, that the major cause of Mae Weaver's neck injury and need for surgical treatment was her work for the Arkansas Department of Correction.

More than a year later, appellant's attorney sent a letter to Dr. Abraham describing appellant's work activities and asking several questions regarding the cause of appellant's injury. In a letter dated September 27, 2013, Dr. Abraham responded in relevant part as follows:

> The following statements will be with a reasonable degree of medical certainty. Ms. Weaver's neck disease was extensive and is probably a combination of factors with work related activity being a definite causative element. One specific incident would not be the cause of cervical spine disease. The work activity that Ms. Weaver performed could affect both her neck and shoulder. The fact that she used her arms and hands for repetitive physical activities is a causative factor for cervical disk disease. When a person engages in strenuous physical activity with the arms it places stress on both the shoulder joint and neck. The subsequent stress can damage the intervertebral disk and facet joints. Patients may not have a significant amount of pain with cervical disk abnormalities, however neurologic dysfunction can be more serious due to the loss of function that may result. Ms. Weaver's complaints were apparent to her and her loss of function was present on her physical exam.

The administrative law judge found that appellant's claim was barred by the statute of limitations. Appellant appealed to the Commission, which concluded that her claim was not barred but that she had failed to prove that her neck condition was causally related to her work-related activities. The Commission noted that appellant failed to report a work-related cervical injury until March 18, 2013, some eight months after her cervical surgery. The Commission found that waiting until after her surgery to attribute her neck condition to her

SLIP OPINION

work was "convenient" and "unbelievable." The Commission further stated as follows:

> Likewise, Dr. Abraham's opinion as to causation is vague and ambiguous, and appears to be based primarily on the claimant's account to him of her injury. Furthermore, while Dr. Abraham stated that the claimant's work-activities "could" have caused her cervical problems, he stated further that the claimant's neck disease was "extensive" and probably caused by a "combination of factors" with work related activity being a factor. We find that this language is too speculative to constitute a medical opinion within a degree of medical certainty as is statutorily required. Therefore, we reject Dr. Abraham's theory of causation.

Noting Dr. Kumar's and Dr. Lipke's findings, the Commission concluded that the preponderance of the evidence demonstrated that appellant's cervical condition was due to deterioration caused by aging. Appellant now appeals the Commission's decision.

In appeals involving claims for workers' compensation, our court views the evidence in a light most favorable to the Commission's decision and affirms the decision if it is supported by substantial evidence. *Galloway v. Tyson Foods, Inc.*, 2010 Ark. App. 610, 378 S.W.3d 210. Substantial evidence exists if reasonable minds could reach the Commission's conclusion. *Id.* The issue is not whether the appellate court might have reached a different result from the Commission; if reasonable minds could reach the result found by the Commission, the appellate court must affirm the decision. *Id.* The Commission is not required to believe any witness, and it may accept and translate into findings of fact only those portions of the testimony that it deems worthy of belief. *Id.*

A claimant seeking benefits for a gradual-onset injury to the neck must prove by a preponderance of the evidence that (1) the injury arose out of and in the course of his employment; (2) the injury caused internal or external harm to the body that required medical services or resulted in disability or death; and (3) the injury was the major cause of

SLIP OPINION

the disability or need for medical treatment. *Kimble v. Labor Force, Inc.*, 2013 Ark. App. 601, 430 S.W.3d 156; Ark. Code Ann. § 11-9-102(4)(A)(ii)(b) & (E)(ii) (Repl. 2012). "Major cause" is defined as more than fifty percent of the cause. Ark. Code Ann. § 11-9-102(14)(A). Medical opinions addressing compensability must be stated within a reasonable degree of medical certainty. Ark. Code Ann. § 11-9-102(16)(B).

Appellant argues that the Commission misinterpreted Dr. Abraham's statement and wrongly determined that his use of the word "could" in one sentence modified and tainted his entire opinion. She argues that Dr. Abraham did not merely find that work-related activity was a factor, as the Commission stated; instead, he found that work-related activity was "a definite causative element." Appellant also claims that the Commission did not refer to the August 31, 2012 correspondence from Dr. Abraham or explain why it should be rejected. ADC claims that the medical reports indicate that appellant's neck condition was worsened by her shoulder surgery, which was not compensable; that appellant never reported to any doctor that her neck condition may be work related; and that Dr. Abraham's reports were speculative. Furthermore, ADC contends that appellant lacked credibility in that she did not conclude her condition was work related until after her neck surgery.

Dr. Abraham opined that appellant's extensive neck disease was probably caused by a combination of factors and that her work activity was a definite causative element. He did not state that the alleged work injury was the major cause of the need for treatment as required for this to be a compensable injury. Regarding Dr. Abraham's earlier

correspondence, he was given two preprinted options to choose from: one stated that work was the major cause of appellant's injury and need for treatment, and the other stated that the neck injury did not result from her work. In this document, there was no option for Dr. Abraham's ultimate opinion that work was one of several causes, and there is no evidence that he had any knowledge at the time of what appellant's work activities were.

It is within the province of the Commission to weigh conflicting medical evidence; however, the Commission may not arbitrarily disregard medical evidence or the testimony of any witness. *Roberts v. Whirlpool*, 102 Ark. App. 284, 289, 284 S.W.3d 100, 104 (2008). Here, the Commission did not arbitrarily disregard or misinterpret Dr. Abraham's opinion. It considered the opinion and gave it appropriate weight in conjunction with the evidence of appellant's degenerative condition as noted by Dr. Kumar and Dr. Lipke. The Commission may accept or reject medical opinions and determine their medical soundness and probative force. *Galloway*, *supra*. We find no merit in appellant's argument.

In *Kimble*, *supra*, the claimant alleged that he had sustained a compensable neck injury from his work throwing tree limbs into a wood chipper. He recalled feeling sore in his shoulder and neck after work, but he did not report any injury or stop work. On his day off, Kimble experienced severe pain in his shoulder and was hospitalized. Based on a cervical MRI, doctors concluded that he suffered from multilevel degenerative disc disease and a posterior central–disc extrusion at C3–4 causing moderate midline ventral-cord impingement. Kimble testified that when advised of the MRI results, he "figured" that his work was

probably what caused it. This court affirmed the Commission's finding that Kimble failed to prove that his neck injury arose out of and in the course of his employment. We noted that he failed to report any type of neck problem to his co-employees or his employer; he left work unaware that he had suffered a neck injury; and he did not report any type of neck problem to his doctors when he sought treatment. The only evidence in the record on causation was Kimble's admittedly speculative testimony that he "figured" that his neck condition had been caused by his work the previous week.

Similarly, here, appellant testified that she "couldn't figure out where else" she could have sustained extensive wear and tear in her neck. She first asserted this conclusion nearly two years after she had left work at the ADC without ever reporting a neck injury. Speculation and conjecture, even if plausible, cannot take the place of proof. *Kimble*, *supra*. We hold that substantial evidence supports the Commission's decision that appellant failed to prove a compensable neck injury.

Affirmed.

WHITEAKER and HOOFMAN, JJ., agree.

*Orr Willhite, PLC*, by: *M. Scott Willhite*, for appellant.

*Robert H. Montgomery*, Public Employee Claims Division, for appellee.